UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------- X
                                          :
UNITED STATES OF AMERICA                  :
                                          :
            v.                            :          No. (S-2) 22 Cr. 409 (HG)
                                          :
VADIM YERMOLENKO,                         :
                                          :
            *Defendant*.                  :
                                          :
-------------------------------------------------- X


**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT VADIM YERMOLENKO'S MOTION
TO DISMISS COUNTS ONE, THREE, FOUR, AND NINE**


Federal Defenders of New York, Inc.
One Pierrepont Plaza
16th Floor
Brooklyn, New York 11201
Tel. (718) 407-7419

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ............................................................................................................... 2

    A.  Yermolenko's Limited Role In The Charged Scheme .................................... 2

    B.  The Alleged *Klein* Conspiracy To Defraud The United States ....................... 3

    C.  The Alleged Conspiracy To Defraud The U.S. Companies ............................. 5

    D.  The Alleged Bank Fraud Conspiracy .............................................................. 5

ARGUMENT ..................................................................................................................... 7

  I.     STANDARD OF REVIEW ..................................................................................... 7

  II.    THE CONSPIRACY TO DEFRAUD COUNT SHOULD BE DISMISSED .................... 8

    A.  The Defraud Clause Requires A Deprivation Of Property. ............................. 8

        1.  The Statutory Text Is Restricted To Property Under *Ciminelli*. ..................... 8

        2.  Section 371 Was Historically Restricted To Property Schemes. ............................. 10

        3.  Expanding The Defraud Clause To Sanctions Was Not Congress's Intent. ............... 11

        4.  Constitutional Principles Further Counsel A Narrow Reading. .................................. 15

        5.  *Ciminelli* Requires A Retreat From Outdated Judicial Policy. ..................................... 17

    B.  Count One Fails To Allege A Deprivation Of Property. ................................. 19

  III.   THE BANK FRAUD CONSPIRACY COUNT SHOULD BE DISMISSED .............. 20

  IV.   THE WIRE FRAUD CONSPIRACY COUNT SHOULD BE DISMISSED ............... 22

    A.  Wire Fraud Requires An Intent To Harm The Charged Victim ..................... 22

    B.  The Government Fails To Allege Intended Harm Of The U.S. Companies ................. 23

  V.    THE MONEY LAUNDERING COUNT SHOULD BE DISMISSED ........................ 25

CONCLUSION .................................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Cases**

*Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005)……………..…………………….4

*Chiarella v. United States*, 445 U.S. 222 (1980)……………..…………………………..……21

*Ciminelli v. United States*, 598 U.S. 306 (2023)……………..…………………………*passim*

*Cleveland v. United States*, 531 U.S. 12 (2000)……………..…………………….....3, 9, 18

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992)……………..………………………10

*Erlenbaugh v. United States*, 409 U.S. 239 (1972)……………..…………………………14

*Evans v. United States*, 504 U.S. 255 (1992)……………..…………………………….9

*Gray v. Alpha & Omega Semiconductor Ltd.*, No. 20-CV-2414 (RA),
    2021 WL 4429499 (S.D.N.Y. Sept. 27, 2021)……………..……………………….....4

*Hammerschmidt v. United States*, 265 U.S. 182 (1924)……………..…………………….8, 11

*Haas v. Henkel*, 216 U.S. 462 (1910)……………..…………………………………11

*In re S. Afr. Apartheid Litig.*, 15 F. Supp. 3d 454 (S.D.N.Y. 2014)……………..……………17

*Johnson v. United States*, 576 U.S. 591 (2015)……………..…………………..……15, 17-18

*Kelly v. United States*, 590 U.S. 391 (2020)……………..…………………………3, 18

*Kousisis v. United States*, No. 23-909 (U.S. Sup. Ct.)……………..……….………………23

*Liparota v. United States*, 471 U.S. 419 (1985)……………..………………………12

*Lochner v. New York*, 198 U.S. 45 (1905)……………..………………………………12

*Loughrin v. United States*, 573 U.S. 351 (2014)……………..……………...………20

*Marinello v. United States*, 138 S. Ct. 1101 (2018)……………..……………………19

*McNally v. United States*, 483 U.S. 350 (1987)……………..……………………...…18

*Nat'l Sm. Bus. United v. Yellen*, -- F. Supp. 3d --,
    2024 WL 899371 (N.D. Ala. Mar. 1, 2024)……………..…………………....3, 21

*Neder v. United States*, 527 U.S. 1 (1999)……………………………………..……………4, 8-9, 20

*Percoco v. United States*, 598 U.S. 319 (2023)………………………………..………………18

*Ratzlaf v. United States*, 510 U.S. 135 (1994)…………………………..…………………4, 12

*Rogers v. Tennessee*, 532 U.S. 451 (2001)………………..………………………………14

*Russell v. United States*, 369 U.S. 749 (1962)………………………..……………………7

*Skilling v. United States*, 561 U.S. 358 (2010)………………..……………..…..…………..17-18

*Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011)………………………………..…………..…12

*United States v. Aleynikov*, 676 F.3d 71 (2d Cir. 2012)…………………………………...7-8

*United States v. Atilla*, 966 F.3d 118 (2d Cir. 2020)…………………………………...19

*United States v. Ballistrea*, 101 F.3d 827 (2d Cir. 1996)……………………………......13

*United States v. Caldwell*, 989 F.2d 1056 (9th Cir. 1993)………………..………….....4, 13, 16-17

*United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022)………………………………......20

*United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012)………………………………………*passim*

*United States v. Countrywide Home Loans, Inc.*, 822 F.3d 650 (2d Cir. 2016)……………..…....20

*United States v. Curran*, 20 F.3d 560 (3d Cir. 1994)…………………………………………15

*United States v. Dhafir*, 461 F.3d 211 (2d Cir. 2006)………………….……………………12, 14

*United States v. Goldberg*, 105 F.3d 770 (1st Cir. 1997)……………………………………15

*United States v. Hirsch*, 100 U.S. 33 (1879)……………………………………………...10-11

*United States v. Hu*, No. 3:20-cr-21,
        2021 WL 4130515 (E.D. Tenn. Sept. 9, 2021)……………………..……………... 24

*United States v. Jackson*, 33 F.3d 866 (7th Cir. 1994)……………….……………………15

*United States v. Klein*, 247 F.2d 908 (2d Cir. 1957)…………………………………………*passim*

*United States v. Minarik*, 875 F.2d 1186 (6th Cir. 1989)……………………………………...15

*United States v. Mohney*, 949 F.2d 899 (6th Cir. 1991)………………………………………16

*United States v. Novak*, 443 F.3d 150 (2d Cir. 2006)……………………………………………22

*United States v. Pierce*, 224 F.3d 158 (2d Cir. 2020)……………………………………………...25

*United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000)……………………………………………...7, 25

*United States v. Resendiz-Ponce*, 549 U.S. 102 (2007)……………………………………………7

*United States v. Rosenblatt*, 554 F.2d 36 (2d Cir. 1977)……………………………….....7-8, 19-20, 22

*United States v. Sadler*, 750 F.3d 585 (6th Cir. 2014)……………………………………………...24

*United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991)………………………………………………...3

*United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007)……………………………………............*passim*

*United States v. Starr*, 816 F.2d 24 (2d Cir. 1987)……………………………………………...22-24

*United States v. Singer*, 963 F.3d 1144 (11th Cir. 2020)………………………………………..…4, 13, 19

*United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016)…………………………………..…24

*United States v. Thrower*, 746 F. Supp. 2d 303 (D. Mass. 2010)…………………………………...16

*United States v. Tuohey*, 867 F.2d 534 (9th Cir. 1989)……………………………………………9, 13

*United States v. Wiltberger*, 18 U.S. 76 (1820)……………………………………………14-15

*Tanner v. United States*, 483 U.S. 107 (1987)………………………………………………...…10

**Other authorities**

U.S. Const., amd. V ...................................................................15

18 U.S.C. § 371 ..........................................................................*passim*

18 U.S.C. § 1344(1) ....................................................................20

18 U.S.C. § 1349 .........................................................................20, 22

18 U.S.C. § 1956(h) ....................................................................25

31 U.S.C. § 5336 .........................................................................12, 21

50 U.S.C. § 1701-02 ...................................................................................................... 12

50 U.S.C. § 1705(c) ....................................................................................................2, 12

50 U.S.C. § 4315(a) ......................................................................................................... 12

50 U.S.C. § 4819(b) ....................................................................................................2, 12

U.S. Dept' of Justice, Criminal Tax Manual § 23.07
 (2024 ed.)………...........................................………………………………...…...13, 15

Abraham S. Goldstein, Conspiracy to Defraud the United States,
 68 Yale L.J. 405 (1959)………....................................………………..……10-11, 13

George L. Metcalfe, Jr., The Estate And Tax Planning Benefits Of Shell Corporations,
 97 Practical Tax Strategies 252 (2016)………..................................…………………3

James Rufus Koren, "How Disney used shell companies to start its Magic Kingdom,"
 L.A. Times (Apr. 9, 2016), at:
 https://www.latimes.com/business/la-fi-disney-shell-companies-20160408-story.html ....3

John A. Townsend, Tax Obstruction Crimes: Is Making the IRS's Job Harder Enough?,
 9 Hous. Bus. & Tax L. J. 255, 353 (2009)………..…....................................……….13

*Trump v. United States*, No. 23-939, Tr. of Oral Arg.
 (Apr. 25, 2024)……………………………………………………………...…...…13

## PRELIMINARY STATEMENT

In this sanctions evasion case, Vadim Yermolenko did not commit sanctions evasion. He is not alleged to have engaged in transactions with any sanctioned individual or entity, or to have shipped any military equipment to Russia. His only charged role was limited to helping a co-defendant buy and ship export-controlled commercial goods without a license. His only charges should likewise be limited to export-control offenses. Yet the government has also charged Yermolenko with four additional counts: three of fraud conspiracy and one of money laundering conspiracy. These should be dismissed. They do not apply to Yermolenko's limited conduct, and they go beyond what Congress intended and the Constitution permits.

The alleged conspiracy to "defraud the United States" under 18 U.S.C. § 371 does not state an offense. The alleged object was not to defraud the United States of property: it was to interfere with sanctions and export controls. The Supreme Court held in *Ciminelli v. United States*, 598 U.S. 306, 309 (2023), that "the federal fraud statutes criminalize only schemes to deprive people of traditional property interests." The doctrine for expanding Section 371 further, under *United States v. Klein*, 247 F.2d 908 (2d Cir. 1957), is no longer sound.

The government also fails to sufficiently allege bank fraud conspiracy. It does not say Yermolenko deceived any bank. Nor is it fraud, without more, if money passing through a bank is secretly meant for illegal purposes—the government does not allege there was any duty to disclose that fact. As for the charged wire fraud conspiracy targeting U.S. companies selling the exported items, lies to a seller are not fraud when the intent is to harm the government, not the seller. That is all that is alleged here. The wire fraud conspiracy count is legally insufficient.

Counts One, Three and Four should be dismissed. Count Nine must be dismissed as a consequence, because there is no remaining predicate for money laundering as to Yermolenko.

# BACKGROUND

## A.    Yermolenko's Limited Role In The Charged Scheme

The Second Superseding Indictment ("S2 Indictment") alleges a scheme to "evade[] U.S. and Western sanctions to acquire sensitive military grade and dual use technologies" for Russia. (S2 Indictment ¶ 1). The scheme used "a network of front companies, shell entities and bank accounts . . . to source, purchase and ship export-controlled items from the U.S. to Russia" (*id.* ¶ 2), exporting "millions of dollars in military and sensitive dual-use technologies" from the U.S. Companies that sold them, in violation of IEEPA, ECRA and other laws (*id.* ¶ 27).[1]

Yermolenko is an American citizen living in New Jersey. (*Id.* ¶ 14). His sole alleged role in the scheme was to assist Boris Livshitz, who managed shell companies and purchased items from the U.S. Companies. (*Id.* ¶¶ 9, 36-41, 45-46). At Livshits' direction, Yermolenko allegedly shipped packages through a New Hampshire residence, altered or destroyed related paperwork, facilitated payments, and opened and managed bank accounts using shell companies. (*Id.* ¶¶ 28-29, 41-42, 47, 91-96). Yermolenko is not alleged to have dealt criminally with any sanctioned entity or individual—he is not charged under the IEEPA—nor is he alleged to have exported any of the military technology highlighted in the S2 Indictment, *i.e.*, "sensitive testing equipment," "a military-grade spectrum analyzer," semiconductors, sniper rifle bullets, "quantum computing and nuclear research technologies," and "tactical military antennas." (*Id.* ¶¶ 51-73).

Yermolenko is charged with conspiracy to defraud the United States (Count One), bank fraud conspiracy (Three), wire fraud conspiracy (Four), money laundering conspiracy (Nine), and conspiracy to violate the ECRA and related counts (Fourteen, Fifteen, Sixteen).

---

[1] The International Emergency Economic Powers Act (IEEPA) criminalizes willful transactions in property of sanctioned persons and entities. 50 U.S.C. § 1705(c). The Export Control Reform Act (ECRA) criminalizes willful violations relating to exports governed by Export Administration Regulations ("EAR"). 50 U.S.C. § 4819(b).

**B.     The Alleged *Klein* Conspiracy To Defraud The United States**

Count One charges a conspiracy to "defraud the United States" under Section 371, *i.e.*, a *Klein* conspiracy. The alleged conduct differs from ordinary fraud in two relevant respects.

*First*, while the object of fraud in the federal fraud statutes must ordinarily be property, *Kelly v. United States*, 590 U.S. 391, 398 (2020), that was not the alleged object here. The alleged object here was to "impair[], imped[e], obstruct[] and defeat[], through deceitful and dishonest means, the lawful functions of OFAC and BIS[2] . . . in the enforcement of economic sanctions laws and regulations, and the issuance of licenses relating to export of goods and the provision of financial services." (S2 Indictment ¶ 75). This does not implicate property. *Kelly*, 590 U.S. at 400-01 (government's "sovereign power to regulate" is not "property" (citation omitted)); *Cleveland v. United States*, 531 U.S. 12, 13 (2000) ("permits or licenses . . . do not qualify as 'property'"); *United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991) (export licenses and government interest in export control of items "ancillary to a regulation" are not "property").

*Second*, and also unlike ordinary fraud, Yermolenko's alleged conduct was not inherently illegal. For example, it is not illegal, without more, to help form shell companies and make financial transactions through them. (S2 Indictment ¶¶ 47, 76(o) & (p)); *see Nat'l Sm. Bus. United v. Yellen*, -- F. Supp. 3d --, 2024 WL 899372, at *1 (N.D. Ala. Mar. 1, 2024) ("shell corporations serve many legitimate purposes"); George L. Metcalfe, The Estate And Tax Planning Benefits Of Shell Corporations, 97 Practical Tax Strategies 252, 253-54 (2016) ("The truth is that there are many valid and legal reasons" to form and use "shell companies," including tax minimization, privacy, and business organization).[3] Nor is it illegal, without more, to "alter[]

---

[2] OFAC and BIS are agencies tasked with sanctions enforcement and export control. (S2 Indictment ¶¶ 4-5, 20-22).
[3] The land for Disney's Magic Kingdom was famously purchased with shell companies to cloak the identity of the buyer. James Rufus Koren, "How Disney used shell companies to start its Magic Kingdom," L.A. Times (Apr. 9, 2016), *at*: https://www.latimes.com/business/la-fi-disney-shell-companies-20160408-story.html

or destroy[] shipping documents and other business records." (S2 Indictment ¶ 42); *see Arthur Andersen LLP v. United States*, 544 U.S. 696, 707 (2005) (persuading someone to destroy, withhold, or alter documents is not inevitably corrupt or wrongful).

True, the alleged object of the conspiracy was to impede the functions of OFAC and BIS. (S2 Indictment ¶ 75). But it is not a crime to do "that which is otherwise permitted, with the goal of making the government's job more difficult." *United States v. Caldwell*, 989 F.2d 1056, 1060 (9th Cir. 1993), *overruled on other grounds*, *Neder v. United States*, 527 U.S. 1 (1999); *Ratzlaf v. United States*, 510 U.S. 135, 144-46 (1994) (arranging bank transactions "[t]o reduce the risk of an IRS audit" or "in order to avoid the impact of some regulation or tax" is not "inevitably nefarious"); *Arthur Andersen*, 544 U.S. at 706-07 ("imped[ing] the Government's factfinding ability" is "innocent conduct").

Furthermore, while Yermolenko is charged with helping Livshits export controlled items without the required licensing, that conduct is only criminal because it is alleged to have been done willfully. (*See* S2 Indictment ¶¶ 41, 92). "The exportation of goods from the United States is not 'so obviously "evil" or inherently "bad" that the "willfulness" requirement is satisfied' even if [the defendant] did not know of the facts that rendered his conduct illegal." *United States v. Singer*, 963 F.3d 1144, 1158 (11th Cir. 2020) (citing *Ratzlaf*, 510 U.S. at 146); *see also Gray v. Alpha & Omega Semiconductor Ltd.*, No. 20-CV-2414 (RA), 2021 WL 4429499, at *3 (S.D.N.Y. Sept. 27, 2021) ("the fact that a U.S. company is exporting goods to an entity on the Entity List does not under all circumstances mean that the company is doing so in violation of export controls"). Yermolenko's conduct was not itself unlawful.

### C.     The Alleged Conspiracy To Defraud The U.S. Companies

The government alleges that Yermolenko conspired to deceive the U.S. Companies with false documents "to conceal the nature of the[] illicit procurement transactions," thereby causing the companies "to sell and export" their technologies illegally, to "process and accept payments in furtherance of such illicit transactions," and to "fail to file" required documentation with governing federal agencies. (S2 Indictment ¶ 28 (citing false "invoices, end use statements, financial records, and shipping documents, among other items"); *see also id.* ¶¶ 32, 36, 39 (false end-use statements); *id.* ¶ 29 ("a variety of front companies and bank accounts" for "shipment from the U.S. Companies" that disguised the "audit trial" and "the true end users")).

But while Count Four duly quotes the statutory language in calling this a "scheme and artifice to defraud" the U.S. Companies (*id.* ¶ 83), the allegations of the S2 Indictment do not support that claim. It alleges an intent to *deceive*, but it nowhere alleges an intent to *harm* the U.S. Companies through that deception. It does not say the companies were meant to lose anything from the transaction, or any material expectation interest would go unfulfilled, or any material contract term was to be breached. It is a fair inference that the scheme's deceit was intended to cause the U.S. Companies to enter into the transactions. (*See, e.g.*, *id.* ¶ 40 (citing their "frustrate[d] due diligence efforts")). But there is nothing from which to infer it intended the company to lose anything from those transactions. Rather, as discussed above, the alleged point of the scheme was to elude the government's sanctions and export control regulations.

### D.     The Alleged Bank Fraud Conspiracy

As discussed above, the S2 Indictment is largely focused on alleged misstatements and omissions with respect to the government and the U.S. Companies. But while the S2 Indictment also charges Yermolenko with bank fraud conspiracy, it nowhere alleges deceit upon any bank.

On the one hand, the S2 Indictment says the alleged scheme "caused" banks "to process millions of dollar-based payments in violation of IEEPA, ECRA and other U.S. laws and regulations." (*Id.* ¶ 28; *see id.* ¶ 48 (Livshits "used funds from the U.S. Bank Accounts" to finance transactions); *id.* ¶ 50 (an example); *id.* ¶ 49 (scheme "used the U.S. Bank Accounts . . . to receive funding" from sanctions-controlled foreign "shell companies" and "to disguise the audit trail and obfuscate the origin, purpose and entities of Russian end users")). On the other hand, the S2 Indictment alleges that the scheme "routed and layered transactions through a variety of front companies and bank accounts." (*Id.* ¶ 29 (money "transferred to accounts in the names of shell companies held at different banks"); *see id.* ¶ 45 (listing "shell companies" or "fictitious corporate entities" that Livshits "used agents and nominees" and EINs to create); *id.* ¶ 46 (Livshits "paid agents and nominees to open bank accounts at U.S. financial institutions in the names of these shell companies"); *id.* ¶ 48 (an example)). There is no allegation any of this involved any lie or omission of any fact required to be disclosed to a bank.

Yermolenko's own alleged conduct illustrates the point: money moving through banks using shell companies, but no alleged deceit. At Livshits' direction, Yermolenko helped open and manage bank accounts for shell companies, including by (a) providing Livshits with his spouse's signature for IRS documents to open accounts, (b) opening "four shell entities" with Livshits' documentation, (c) giving Livshits account information "for the bank accounts of five different shell companies," (d) opening an account with Livshits' documentation, depositing a check for $44,400.84, immediately transferring most of that to two Livshits "front companies" and withdrawing the remainder, (e) being directed by Livshits to troubleshoot unsent wires, and (f) receiving a "Wells Fargo token" from Livshits. (*Id.* ¶ 47). At no point is Yermolenko alleged to have knowingly lied to a bank or omitted something he had a duty to disclose.

## ARGUMENT

### I.    STANDARD OF REVIEW

It is a "constitutional requirement[]" that an indictment "contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend." *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (citation omitted). This ensures the defendant is "tried on the evidence presented to the grand jury," and, as "[a]n important corollary," "allow[s] [the] court to evaluate whether [the] facts alleged could support conviction." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) (citing *Russell v. United States*, 369 U.S. 749, 768-70 (1962)).

An indictment must be dismissed if it "fails to allege the essential facts constituting the offense charged." *Id.* at 91 (insufficiently alleged facts warranted dismissal); *Russell*, 369 U.S. at 754-55 (same); *United States v. Rosenblatt*, 554 F.2d 36, 42 (2d Cir. 1977) (same). Moreover, "a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012) (indictment "legally insufficient" where alleged "conduct did not constitute an offense"); *United States v. Shellef*, 507 F.3d 82, 109 (2d Cir. 2007) (same).

Four additional principles guide review. First, the issue is "the sufficiency of the indictment, not the sufficiency of the evidence." *Shellef*, 507 F.3d at 107. Second, "the indictment must be considered as it was actually drawn, not as it might have been drawn." *Pirro*, 212 F.3d at 92. Third, in this pretrial posture, Yermolenko "is entitled to a more exacting review of the indictment." *Id.* Finally, if the statute "includes generic terms," it is "not sufficient" for the indictment to simply repeat those terms: "it must descend to particulars." *Id.* at 92-93 (citing *Russell*, 369 U.S. at 765).

## II.      THE CONSPIRACY TO DEFRAUD COUNT SHOULD BE DISMISSED

Yermolenko is charged in Count One with participating in a *Klein* conspiracy "to defraud the United States" under 18 U.S.C. § 371.[4] *Klein* held that the defraud clause of Section 371 "not only includes the cheating of the government out of property or money," but also includes, as here, deceit that "interfere[s] with or obstruct[s] one of its lawful governmental functions." 703 F.3d at 61-62 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)).

That doctrine is no longer sound. The Supreme Court unanimously held in *Ciminelli* that the words "to defraud" in the "federal fraud statutes" criminalize "only schemes to deprive people of traditional property interests." 598 U.S. at 309. This holding necessarily applies to Section 371. *Klein*, on the other hand, relied upon outdated, *Lochner*-era judicial policy with no basis in the text or history of the statute; its holding is at odds with both Congressional intent and the Supreme Court's modern, strict construal of criminal statutes. Because the indictment fails to allege that the scheme was intended to deprive the United States of property, it fails to allege a crime. Count One should be dismissed. *See Aleynikov*, 676 F.3d at 75-76; *Shellef*, 507 F.3d at 109; *Rosenblatt*, 554 F.2d at 42.

### A.      The Defraud Clause Requires A Deprivation Of Property

#### 1.      The Statutory Text Is Restricted To Property Under *Ciminelli*.

After *Ciminelli*, the text of Section 371 necessarily restricts the defraud clause to conspiracies involving traditional property interests. The analysis is straightforward. Section 371 uses the term "to defraud." That term is presumed to have its original meaning under common law "when the statute was enacted." *Ciminelli*, 598 U.S. at 312; *see also Neder*, 527 U.S. at 21 ("It is a well-established rule of construction" that "a court must infer, unless the statute

---

[4] Section 371 prohibits conspiracies "to commit any offense against the United States" (the "offense clause"), or "to defraud the United States, or any agency thereof in any manner or for any purpose" (the "defraud clause").

otherwise dictates, that Congress means to incorporate the established meaning" of common law terms); *Evans v. United States*, 504 U.S. 255, 259 (1992) (statutory terms are "presumed" to have their "common law meaning").

When the predecessors to the modern fraud statutes were enacted after the Civil War, "the 'common understanding' of the words 'to defraud' . . . referred 'to wronging one in his property rights.'" *Ciminelli*, 598 U.S. at 312 (quoting *Cleveland*, 531 U.S. at 19); *see also United States v. Coplan*, 703 F.3d 46, 59 & n.17 (2d Cir. 2012) (citing "[t]he authoritative dictionary of the day"); *United States v. Tuohey*, 867 F.2d 534, 536-37 (9th Cir. 1989) (Section 371 and the mail fraud statute "[b]oth date from the same period in our history").

In *Ciminelli*, the Supreme Court found that the words "to defraud" in the mail and wire fraud statutes incorporated this common law meaning, rejecting the Second Circuit's "right to control" theory of fraud, under which a scheme to deprive someone of mere intangible economic information—rather than traditional property rights—could be enough for liability. 598 U.S. at 309. It was of no importance that the right to control had been established law in this Circuit for over 30 years. *Id.* at 313. What mattered was it ran contrary to "the original meaning" of the statutory term "to defraud," which criminalizes "*only* schemes to deprive people of traditional property interests." *Id.* at 309 (emphasis added).

Here too, the original meaning of the term "to defraud" in Section 371 must control, notwithstanding *Klein*'s longstanding expansion of those words to encompass non-property schemes. As with the mail and wire fraud statutes, the text of the defraud clause is presumed to incorporate its common law meaning.[5] Accordingly, like its companion fraud statutes, the

---

[5] The term "to defraud" is modified by the phrase "in any manner or for any purpose." 18 U.S.C. § 371. "This modification obviously extends 'defraud' to its limits, but those limits cannot extend beyond the reasonable meaning of the word modified." *Tuohey*, 867 F.2d at 537 n.1.

defraud clause of Section 371 criminalizes "only schemes to deprive people of traditional property interests." *Id.* at 309. That is the natural result of *Ciminelli*.

If this Court were writing on a clean slate, the inquiry would end with the statutory text. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992). But the slate is not clean. So we look also to legislative history, the statutory scheme, and modern Supreme Court precedent to confirm that *Klein*—and the outdated language *Klein* relied upon—is no longer good law under *Ciminelli*.

2.    <u>Section 371 Was Historically Restricted To Property Schemes.</u>

The predecessor to Section 371 was enacted in a legislative setting focused on conspiracies to deprive the government of property. The statute originated from the post-Civil War Congress's attempt to reconcile "insistent demands for relief from the tax burden [on] an immature economy" with the government's "need for large revenues." Abraham S. Goldstein, Conspiracy To Defraud the United States, 68 Yale L.J. 405, 417 (1959). Congress determined to "collect more efficiently that which was already taxable," by enacting criminal laws to enforce "excise taxes on whisky," which "suppl[ied] the greatest part of the federal revenue." *Id.*

The defraud clause's predecessor was enacted pursuant to this revenue-collection effort. *Id.* at 418. The legislative history is "stingy." *Tanner v. United States*, 483 U.S. 107, 131 (1987). But it is a "certainty" that the statute "was enacted at a time and in a setting which strongly suggest that it was aimed at conspiracies either to commit offenses against the internal revenue or to defraud the United States of internal revenue." Goldstein, *supra*, at 418.

The defraud clause achieved its modern textual form in 1874, when the relevant provision was recodified into the "general penal provisions" of the federal code. *Id.* at 418 n.36. Even then, its use of the term "to defraud" was still understood to refer to money or property. *United States v. Hirsch*, 100 U.S. 33, 35 (1879) ("The conspiracy here described is a conspiracy to commit any

10

offence against the United States. The fraud mentioned is any fraud against them. It may be against the coin, or consist in cheating the government of its land or other property.").

In sum, as the government has "implicitly conced[ed]" in prior litigation, there is "nothing . . . recognizable as statutory interpretation"—nothing in the "plain meaning, legislative history, or interpretive canons"—that could justify the subsequent judicial expansion of the defraud clause beyond its original meaning to non-property conspiracies. *Coplan*, 703 F.3d at 61. Rather, such a reading "appears to rest upon a policy judgment." *Id.* As discussed below, however, a judicial policy judgment cannot create a new crime.

### 3. Expanding The Defraud Clause To Sanctions Was Not Congress's Intent.

The policy underlying an "expansive reading" of the defraud clause is this: "a conspiracy to defraud the *Government* is to be read more broadly than a conspiracy to defraud a private person." *Id.* But in the modern sanctions and export-control context, Congress has repeatedly adopted a different policy, narrowing criminal liability to willful violations of specific regulations. Reading the defraud clause "more broadly" runs afoul of this Congressional scheme.

Section 371's predecessor was enacted when the federal criminal code was in a "primitive state," with "only a handful of substantive crimes." Goldstein, *supra*, at 440. By the 20th century, "[w]ith the activities of the federal government fast outstripping the ability of Congress to fashion criminal statutes to guard federal processes," there came pressure to make the statute "an appropriate catch-all category" for any conduct "deemed to be deserving of punishment." *Id.* That was the context in which the *Lochner* Court, first in *Haas v. Henkel*, 216 U.S. 462, 479 (1910) (later limited to its facts), and then in dictum in *Hammerschmidt*, 265 U.S.

11

at 188, assumed the defraud clause could apply to non-property schemes.[6] The *Klein* doctrine is simply "a quotation from *Hammerschmidt*." *Coplan*, 703 F.3d at 60-61.

But times have changed. The modern economic sanctions regime contains no "catch-all category" of criminal liability. Consider the IEEPA, enacted in 1977. That statute confers upon the President the power, in the event of a "national emergency," to respond to certain foreign threats by, among other things, criminalizing certain commercial activities, specifically delineated by regulation, including "transactions in foreign exchange," certain bank "transfers of credit or payments," "the importing and exporting" of certain "currency or securities," and foreign-owned property. *United States v. Dhafir*, 461 F.3d 211, 213 (2d Cir. 2006); *see* 50 U.S.C. §§ 1701-02 & 1705(c). This statutory delegation of authority, including the "authority to define criminal offenses," is "defined and limited," balancing Congress's sole "power to define criminal conduct" with the President's unique role to act in the realm of foreign affairs, "with its important, complicated, delicate, and manifold problems." *Dhafir*, 461 F.3d at 215-17.

Moreover, IEEPA, like other modern sanctions-related statutes, establishes criminal punishment only for willful misconduct. *See* 50 U.S.C. § 1705(c) (IEEPA); 50 U.S.C. § 4819(b) (ECRA); *see also, e.g.*, 50 U.S.C. § 4315(a) (Trading With the Enemy Act); 31 U.S.C. § 5336(h)(1) (Corporate Transparency Act). This willfulness requirement exists "to ensure that the defendant acted with a wrongful purpose." *Ratzlaf*, 510 U.S. at 143 (citation omitted). It is "particularly appropriate" when a lesser scienter would "criminalize a broad range of apparently innocent conduct." *Liparota v. United States*, 471 U.S. 419, 426 (1985). In other words, Congress's manifest intent, enacted in multiple specific statutes, was to establish criminal

---

[6] In the "happily bygone era" of *Lochner v. New York*, 198 U.S. 45 (1905), "much abused" Supreme Court "power" notoriously "resulted in the constitutionalization of economic theories preferred by individual jurists." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 591-92 (2011) (Breyer, J., dissenting).

liability for sanctions- and export-control-related conduct that is not obviously illegal—for example, shipping something to another country, establishing a shell corporation for payment purposes, or throwing away an invoice—only if the conduct is undertaken with knowledge that it is, in fact, prohibited. *See* pp.3-4 *supra*; *Singer*, 963 F.3d at 1158 ("[W]hen it comes to crimes involving complex regulatory schemes, we generally do not criminally punish individuals engaged in conduct they reasonably believed to be innocent.").

The defraud clause, as extended to the sanctions context, is limited in none of these respects. As the government, two sitting Justices, and a variety of judges and scholars have observed, it is extraordinarily broad, even vague, in scope. *See* U.S. Dept' of Justice, Criminal Tax Manual § 23.07[1][b] (2024 ed.) ("encompasses a wide array of conduct"); *Trump v. United States*, No. 23-939, Tr. of Oral Arg. (Apr. 25, 2024) at 82-83 (Justice Kavanaugh: "vague"); *id.* at 98-99 (Justice Alito: "peculiarly open-ended"); *Shellef*, 507 F.3d at 106 (reiterating "the need for particular vigilance" in defraud clause prosecutions "in view of the broad range of conduct covered"); *Caldwell*, 989 F.2d at 1059 ("This is a very broad provision, which subjects a wide range of activity to potential criminal penalties."); *Tuohey*, 867 F.2d at 537 ("broad, vague [basis] for criminal liability"); John A. Townsend, Tax Obstruction Crimes: Is Making the IRS's Job Harder Enough?, 9 Hous. Bus. & Tax L. J. 255, 353 (2009); Goldstein, *supra*, at 463 ("vague," "shadowy," "broad," even "Kafkaesque" basis for liability). Notably, it does not contain a willfulness provision. *See United States v. Ballistrea*, 101 F.3d 827, 832 (2d Cir. 1996).[7]

Congress's modern adoption of narrowly defined sanctions- and export-control-related crimes further undermines the notion that it intended this extraordinarily broad Civil War-era

---

[7] *Ballistrea* reserved the question whether willfulness "must be imported" in an appropriate context. 101 F.3d at n.1. If this motion is denied, the defense will so request.

statute to apply to the same context. As expanded by the courts, defraud clause liability is not restricted to "defined and limited" categories of willful misconduct. Under *Klein*, it could be a crime under Section 371 to follow someone's instruction to throw away an invoice relating to an export-controlled item, or to form otherwise legitimate "shell companies" to pay for them, even when the conduct is not otherwise a crime. Moreover, that Congress intended in IEEPA, for example, to delegate its authority to make crimes only in specific, limited respects undermines the notion that it simultaneously intended any United States Attorney to be able to prosecute far *broader* conduct touching foreign affairs, without any express delegation of authority or intelligible limiting principle. *See Dhafir*, 461 F.3d at 216-17 (delegations to the Executive contain an "intelligible" limiting principle and "specific guidance" by Congress). It would be odd indeed for Congress to address sanctions-related crimes with such narrow precision and care for constitutional balance while simultaneously intending to occupy the field with a broad swath of Section 371 liability. Plainly, it did not intend such a bizarre expansion of the defraud clause. *See Erlenbaugh v. United States*, 409 U.S. 239, 243-44 (1972) (later acts can "be regarded as a legislative interpretation of an earlier act" and "aid[] in ascertaining [its] meaning" (citation omitted)).

The problem more generally is that the defraud offense has become "a common law crime, created by the courts rather than by Congress." *Coplan*, 703 F.3d at 61. Whatever the merit of such a reading in the *Lochner* era, "the notion of a common-law crime is utterly anathema today." *Id.* (quoting *Rogers v. Tennessee*, 532 U.S. 451, 476 (2001) (Scalia, J., dissenting)). Indeed, it was anathema well before *Lochner*. As a centuries-old "rule," "[i]t is the legislature, not the Court, which is to define a crime," and "[i]t would be dangerous" for a court "to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred

14

character, with those which are enumerated." *United States v. Wiltberger*, 18 U.S. 76, 96 (1820) (Marshall, C.J.). Yet that is precisely what *Klein* has done.

### 4. Constitutional Principles Further Counsel A Narrow Reading.

Principles of constitutional avoidance and lenity confirm that the defraud clause should be read narrowly, consistent with its text, history, and Congressional intent, to require a deprivation of property interests.

For example, it is now well-known that expansion of the defraud clause to non-property crimes has created unconstitutional vagueness. *See supra* p.13. The Fifth Amendment prohibits punishment "under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). "[T]he failure of 'persistent efforts . . . to establish a standard'" of criminal liability under a law "can provide evidence of vagueness." *Id.* at 598 (citation omitted). In attempting to extend the defraud clause beyond its common law meaning, courts have persistently tried and failed to establish consistent standards for liability. For example, the circuits have split on whether willfulness is required for some non-property conspiracies, *compare United States v. Jackson*, 33 F.3d 866, 871-72 (7th Cir. 1994) (no), *with United States v. Curran*, 20 F.3d 560, 571 (3d Cir. 1994) (yes); and how to define the object of the conspiracy, *see* Department of Justice, Criminal Tax Manual § 23.07[4][c] (2024 ed.) (three contradictory "line[s] of cases"); *United States v. Goldberg*, 105 F.3d 770, 774-75 (1st Cir. 1997) ("[v]olumes could be written" on the subject; citing "the vagueness of the concept of interfering with a proper government function" and noting its "special capacity for abuse"). Circuits have even created internally contradictory standards. *Compare United States v. Minarik*, 875 F.2d 1186, 1194 (6th Cir. 1989) (defraud clause cannot be charged if alleged conduct is covered by a specific offense)

*with United States v. Mohney*, 949 F.2d 899, 902 (6th Cir. 1991) (opposite conclusion). Such confusion reflects irredeemable vagueness.

Further evidence: The Supreme Court in *Ciminelli* warned against interpreting fraud statutes to criminalize "any deceptive act." 598 U.S. at 315. Yet there is virtually no limit to the government "function" that can be the object of a defraud conspiracy unbounded by any property requirement. The government has secured conspiracy to defraud convictions even for ethics violations. *United States v. Thrower*, 746 F. Supp. 2d 303, 306 (D. Mass. 2010) ("Thrower knew it was a violation of federal ethics regulations for him to participate in the contracting process without disclosing his personal relationship with his sister's company."). But *Ciminelli* struck down right to control liability in large part because it criminalized such "traditionally civil" matters. 598 U.S. at 316 (citing conviction based on an "undisclosed conflict of interest").

Making matters worse, the government's *own* view is that the statute contains *no* limiting standard. In *Caldwell*, the defendant was convicted of conspiracy to defraud the IRS for helping her clients "keep their financial transactions secret," with "numbered accounts," maintaining "no records of clients' transactions," and nondisclosure policies. 989 F.2d at 1059. The "ostensible goal" was "privacy," but the privacy helped clients "avoid paying taxes." *Id.* The government's theory was that, even though the defendant's conduct was not "done deceitfully or dishonestly," the defendant was nonetheless guilty of conspiracy to defraud the IRS because "people have a duty 'not to conduct their business affairs in such a manner that the IRS would be impeded and impaired in its . . . collection of revenue.'" *Id.* (citation omitted).

The Ninth Circuit reversed the conviction. It pointed out that, "[u]nder the government's theory, a husband who asks his wife to buy him a radar detector would be a felon" (obstructing "the government function of catching speeders"), as would the business competitor of "a

government-run enterprise" which "lowers its prices to siphon off the government's customers," as would landowners who refuse to sell to the government, etc. *Id.* at 1060 ("The federal government does lots of things, more and more every year, and many things private parties do can get in the government's way. It can't be that each such action is automatically a felony."). The problem is not just overbreadth. Worse, it is that the prosecutors tasked with enforcing the defraud clause could maintain and defend such a terrifyingly arbitrary position under the prevailing judicial interpretation. That is perhaps the surest sign of that interpretation's vagueness. *Johnson*, 576 U.S. at 595 (a "standardless" statute leads to "arbitrary enforcement").

Interpreting the defraud clause consistent with its text, history, and Congressional intent avoids these constitutional problems. It is no longer difficult to define the object of the conspiracy, the requisite scienter, or the domain of plainly criminal conduct if one simply prohibits only schemes intended to deprive the government of traditional property. *See Skilling v. United States*, 561 U.S. 358, 412 (2010) (restricting honest services fraud to accepting bribes and kickbacks cures vagueness problem of broader interpretation). The doctrine of constitutional avoidance counsels a narrow reading. *Id.* at 408-09. "Further dispelling doubt on this point is the familiar principle that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *Id.* at 410. If the defraud clause can sensibly be called ambiguous after *Ciminelli*, it must be read, in favor of the defendant, to require a deprivation of property.

5.      *Ciminelli* Requires A Retreat From Outdated Judicial Policy.

This Court is "bound by Second Circuit precedent 'unless it is expressly or implicitly overruled' by the Supreme Court or an *en banc* panel of the Second Circuit." *In re S. Afr. Apartheid Litig.*, 15 F. Supp. 3d 454, 459-60 (S.D.N.Y. 2014) (citations omitted). Under this standard, *Klein* is no longer binding precedent, because its rationale has been overruled,

17

implicitly or expressly, by the Supreme Court in *Ciminelli*. *Id.* As we have explained, *Ciminelli* held that it is the "original meaning" of the words "to defraud" in the "federal fraud statutes" that must control, not subsequent judicial expansions of that meaning to non-property crimes. *Klein*'s judicial policy rationale, which expanded those words beyond their original meaning, is in direct contravention of *Ciminelli*, and is therefore no longer binding.

Indeed, *Ciminelli* is just the latest in a series of modern Supreme Court decisions overturning fraud convictions for non-property-related conduct. *See Kelly*, 590 U.S. at 398-99; *Cleveland*, 531 U.S. at 18; *McNally v. United States*, 483 U.S. 350, 360 (1987). This line of cases is itself part of a more general modern approach, systematically narrowing longstanding broad interpretations of criminal statutes. *E.g.*, *Johnson*, 576 U.S. at 597 (residual clause of Armed Career Criminal Act struck down as vague, overruling two prior Supreme Court decisions); *Percoco v. United States*, 598 U.S. 319, 329 (2023) (rejecting Second Circuit's 30-year-old dominance and control theory of honest services as "too vague"); *Skilling*, 561 U.S. at 408-09 (restricting post-*McNally* honest services fraud statute to bribery and kickbacks to avoid "vagueness"). *Klein* runs contrary to this body of intervening precedent.

More than a decade ago in *Coplan*, the Second Circuit turned away an invitation to return the defraud clause to its original meaning, even though it found the argument had "force[];" that the government had "nothing . . . recognizable as statutory interpretation" to rebut the point that "the *Klein* conspiracy theory is textually unfounded;" and that the government's implicit concession that "the *Klein* conspiracy is a common law crime, created by the courts rather than Congress," warranted "considerable judicial skepticism." 703 F.3d at 61-62. At that time, the arguments were "properly directed to a higher authority" because *Skilling*—which "pared" the honest services fraud statute to its core conduct—was not sufficiently on point. *Id.* at 62; *see also*

18

*United States v. Atilla*, 966 F.3d 118, 131 (2d Cir. 2020) (rejecting similar argument based upon

*Marinello v. United States*, 138 S. Ct. 1101 (2018), concerning a "wholly unrelated" tax statute).

*Ciminelli* is now on point. Its rationale directly and squarely contradicts both *Klein* and

the outdated policy *Klein* relied upon. *Ciminelli* requires, finally, a retreat to the text, history, and

Congressional intent, away from the unconstitutional crime that *Klein* created. It requires that the

government plead and prove a deprivation of property.

### B.      Count One Fails To Allege A Deprivation Of Property

Here, the object of the *Klein* conspiracy was to interfere with the government "in the

enforcement of economic sanctions laws and regulations, and the issuance of licenses relating to

export of goods and the provision of financial services." (S2 Indictment ¶ 75). This does not

allege a deprivation of property. *Supra* p.3. Because that is an essential element, Count One

should be dismissed. *See Shellef*, 507 F.3d at 109; *Rosenblatt*, 554 F.2d at 42.

The S2 Indictment vividly illustrates the problems with stretching the defraud clause into

the vague reaches beyond its original meaning and Congress's intent. As we have explained,

none of the conduct with which Yermolenko is charged—forming otherwise legitimate shell

companies and arranging financial transactions through them, destroying documents, or shipping

goods out of the United States, etc.—is inevitably illegal. *Supra* pp.3-4. Generally speaking,

"when it comes to crimes involving complex regulatory schemes, we generally do not criminally

punish individuals engaged in conduct they reasonably believed to be innocent." *Singer*, 963

F.3d at 1158. Yet that is precisely what expanding the defraud clause to Yermolenko's conduct

allows the government to do.[8]

---

[8] To be sure, Yermolenko is also charged under the ECRA. But that hardly solves the problem. Yermolenko could
be acquitted of that offense, yet convicted under the defraud clause for conduct he reasonably believed was lawful.

We do not suggest that Yermolenko's conduct was laudable. But the "federal fraud statutes are not catch-all laws designed to punish all acts of wrongdoing or dishonorable practices." *United States v. Connolly*, 24 F.4th 821, 834 (2d Cir. 2022). "[T]he mere fact that the defendant's conduct was improper, objectionable, or even despicable" is not sufficient. *Id.* Rather, "before one can be punished" for fraud, "it must be shown that his case is plainly within the statute." *Id.* (citations omitted). Yermolenko's case is not plainly within the defraud clause. Count One should be dismissed.

## III.   THE BANK FRAUD CONSPIRACY COUNT SHOULD BE DISMISSED

Yermolenko is charged in Count Three with bank fraud conspiracy. *See* 18 U.S.C. § 1349. The alleged object of the scheme was to defraud four banks, in violation of the bank fraud statute's defraud clause, 18 U.S.C. § 1344(1). (S2 Indictment ¶ 81). But it is not alleged that Yermolenko practiced or contemplated any material deception against those banks. Count Three must therefore be dismissed. *See Shellef*, 507 F.3d at 107; *Rosenblatt*, 554 F.2d at 42.

It is axiomatic that "fraud requires proof of deception." *United States v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 660, 662-63 (2d Cir. 2016); *see also Loughrin v. United States*, 573 U.S. 351, 357 (2014) ("the requirement that a defendant intend to 'defraud a financial institution' . . . is § 1344(1)'s whole sum and substance"). Any such deception must be material. *Countrywide*, 822 F.3d at 657 (citing *Neder*, 257 U.S. at 21).

As discussed above, the vast bulk of the S2 Indictment alleges misstatements and omissions with respect to the United States and the U.S. Companies. *Supra* pp.1-5. The alleged conduct with respect to banks is far more limited. It is that the alleged scheme, on the one hand, caused banks to process payments in violation of sanctions and export control-related laws and regulations, and, on the other, layered transactions through shell companies and bank accounts.

20

Yermolenko's own conduct was to, at Livshits' direction, help open and manage bank accounts for shell companies and make financial transactions with those accounts. *Supra* pp.5-6.

None of this involves cognizable deceit. The government does not competently allege any false statement to any bank. In fact, the S2 Indictment does not even *say* there was deceit. And while the government alleges that the scheme concealed the fact that funds moving through the banks accounts were meant for illegal purposes, that is not itself criminally deceitful or fraudulent absent some duty to tell the bank. *See Chiarella v. United States*, 445 U.S. 222, 235 (1980) ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."); *cf. Klein*, 247 F.2d at 916 ("[m]ere failure to disclose income would not be sufficient" to establish fraud upon the IRS). Here, no reporting requirement is alleged.

Similarly for the bank accounts of the supposed "shell companies," the government does not allege those companies were themselves otherwise illegal, or that their bank accounts were deceitfully established. The term "shell company" is pejorative, but it does not entail illegality; to the contrary, shell companies are legitimate under corporate law. *Supra* pp.3-4. There is no indication—let alone allegation—in the S2 Indictment that opening and using the accounts in the names of shell companies, or using paid nominees and agents, was deceitful.[9] Indeed, it was not until the recently enacted Corporate Transparency Act that "most entities incorporated under State law" were required "to disclose personal stakeholder information," to prevent, *inter alia*, "money laundering" by "shell corporations." *Yellen*, 2024 WL 899372, at *1; *see* 31 U.S.C. § 5336. The charged scheme predated the CTA's requirements, the earliest of which began on January 1, 2024, *see id.* at *3; 31 U.S.C. § 5336(a)(2), and the use of "shell company" bank accounts is not alleged to *ipso facto* require disclosure before that date.

---

[9] The S2 indictment alleges that Mr. Yermolenko provided his spouse's signature for certain corporate and bank application documents, but does not allege that his spouse's participation was in any way noncompliant.

## IV.     THE WIRE FRAUD CONSPIRACY COUNT SHOULD BE DISMISSSED

Yermolenko is charged in Count Four with wire fraud conspiracy. *See* 18 U.S.C. § 1349. The alleged object was to deceive the U.S. Companies into selling "military and sensitive dual-use technologies" the defendants secretly intended for "Russian end users," in violation of sanctions laws. (S2 Indictment ¶¶ 83, 27). The S2 Indictment alleges a scheme to deceive, not to defraud. Count Four must be dismissed. *See Shellef*, 507 F.3d at 107; *Rosenblatt*, 554 F.2d at 42.

### A.     Wire Fraud Requires An Intent To Harm The Charged Victim

A scheme to deceive is not a scheme to defraud. *Shellef*, 507 F.3d at 109; *United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006); *United States v. Starr*, 816 F.2d 24, 98 (2d Cir. 1987). An indictment charging a scheme to defraud "is required to allege," in addition to deception, "that the defendant contemplated actual harm that would befall victims due to his deception." *Shellef*, 507 F.3d at 107 (citing *Novak*, 443 F.3d at 156).

In *Starr*, the defendants, bulk-mail shippers, were charged with mail fraud[10] for hiding "high-rate mail in low-rate mail packages," paying the U.S. Post Office "the low-rate price," and falsely telling their customers "the mailings were high-rate." *Shellef*, 507 F.3d at 108 (discussing *Starr*). The Second Circuit reversed their convictions. It held that their "misappropriation of funds simply ha[d] no relevance to the object of the contract" with their customers, "namely, the delivery of mail to the appropriate destination in a timely fashion." *Starr*, 816 F.2d at 100. The customers were deceived, but "there was no contemplated *harm* to the customers" because they "received exactly what they paid for" and "there was no discrepancy between benefits reasonably anticipated and actual benefits received." *Id.* at 98-99 (citations omitted, emphasis added). The cheating of the government out of its high rates, by contrast, *was* a scheme to

---

[10] The mail and wire fraud statutes are construed *in pari materia*. *Ciminelli*, 598 U.S. at 312 n.2.

defraud. Judge Newman's concurrence observed that "[a]n indictment for defrauding the Postal Service would have led to a conviction that would surely have been affirmed." *Id.* at 102.

In *Shellef*, similarly, the defendants bought an industrial chemical from its manufacturer. 507 F.3d at 87. The chemical was "exempt from excise taxes if its sale comport[ed] with applicable federal statutory and regulatory requirements," and while the defendants told the manufacturer that they would sell the chemical in compliance, that was false. *Id.* The indictment alleged fraud because the manufacturer "would not have sold" the chemical "had it known" of the intended noncompliance. *Id.* at 109. The Second Circuit held this was not "legally sufficient." *Id.* "As in *Starr*," there was no allegation of intended harm to the *manufacturer* from this deceit, and end-use compliance was not alleged to be an "'essential element' of the bargain." *Id.*[11]

## B.    The Government Fails To Allege Intended Harm Of The U.S. Companies

Similarly here, the S2 Indictment does not allege that the purported wire fraud scheme intended harm to the U.S. Companies due to the alleged deception. There is no allegation of any "discrepancy" between "benefits" the companies "reasonably anticipated" and what they "actually received." *See Shellef*, 507 F.3d at 109; *Starr*, 816 F.2d at 98. There is no allegation that end-use compliance was an "'essential element' of the bargain—the S2 Indictment does not mention the contract terms, let alone whether any alleged misrepresentations had "relevance" to them. *See Shellef*, 507 F.3d at 109; *Starr*, 816 F.2d at 100. The wire fraud count fails to allege a legally sufficient scheme to defraud, and it must be dismissed.  *See Shellef*, 507 F.3d at 109.

As in *Starr* and *Shellef*, it is not fraud to deceive a business, if the purpose of the deceit is to hurt the government, not the business. The question, for wire fraud purposes, is not whether an

---

[11] The Supreme Court recently granted certiorari to consider whether deception to induce a commercial exchange can constitute mail or wire fraud, even if inflicting economic harm on the alleged victim was not the object of the scheme. *See Kousisis v. United States*, No. 23-909.

indictment for defrauding the government might be sufficient. Rather, it is whether the charge of defrauding the U.S. Companies would lead "to a conviction that must be reversed." *Starr*, 816 F.2d at 102 (Newman, J., concurring). It would.[12]

To be sure, it is plain from the S2 Indictment that the U.S. Companies would not have sold their technologies had they known where they were intended to go ultimately. *Supra* p.5. But that does not matter. What is required is an allegation of intent to harm. It is not enough to allege that the conspiracy "induced" the sellers "to enter into a transaction [they] would otherwise have avoided." *Shellef*, 507 F.3d at 109 (citation omitted); *Novak*, 443 F.3d at 158-59 (that the alleged victims would not have entered into the transaction "had they been aware" of defendant's hidden deception was "inadequate to support a finding of fraudulent intent"). In other words, if a buyer "paid full price" for a product, it is not enough, for wire fraud purposes, that the sellers "would not have sold had they known the truth" about the product's intended end use. *United States v. Sadler*, 750 F.3d 585, 590-91 (6th Cir. 2014) (Sutton, J.) (wire fraud statute does not "stretch . . . to cover the right to accurate information before making an otherwise fair exchange"); *United States v. Takhalov*, 827 F.3d 1307, 1314 (11th Cir. 2016) (no wire fraud "even if a defendant lies, and even if the victim made a purchase because of that lie," where "the alleged victims 'received exactly what they paid for'" (quoting *Shellef*, 507 F.3d at 108)); *United States v. Hu*, No. 3:20-cr-21, 2021 WL 4130515, at *14 (E.D. Tenn. Sept. 9, 2021) ("the fact that a defendant merely induced a victim to enter into a transaction that he otherwise would have avoided is insufficient to establish the offense of wire fraud").

---

[12] Unlike in *Starr*, here the charge of conspiracy to defraud the United States would also lead to a conviction that must be reversed. But that is only because, unlike in *Starr*, the object of the alleged scheme here was not to obtain property, it was to violate the ECRA and related export-control offenses. *Those* charges are sufficient as pleaded.

Finally, it is not enough for the S2 Indictment to recite the generic "scheme and artifice to defraud" language from the statute. *Supra* p.5. For such generic terms, the indictment must "descend to particulars" to survive this Court's "exacting review." *Pirro*, 212 F.3d at 92. Here, the missing particular is an intent to harm. As in *Shellef*, even when an indictment duly recites the statutory language, in addition "it is required to allege that the defendant contemplated actual harm that would befall victims due to his deception in order to meet the 'scheme to defraud' prong." 507 F.3d at 107-08. The S2 Indictment does not.

## V.   THE MONEY LAUNDERING CONSPIRACY COUNT SHOULD BE DISMISSED

Count Nine charges Yermolenko with money laundering conspiracy under 18 U.S.C. § 1956(h). It is based upon predicate "unlawful activity" that Yermolenko is not charged with (IEEPA conspiracy) or that is not unlawful (wire fraud conspiracy). The money laundering conspiracy count should be dismissed. *See United States v. Pierce*, 224 F.3d 158, 160 (2d Cir. 2020).

### CONCLUSION

For the foregoing reasons, Counts One, Three, Four, and Nine should be dismissed for failure to state an offense.

Respectfully submitted,

/s James Darrow

James Darrow
Nora K. Hirozawa
  Assistant Federal Defenders
Federal Defenders of New York, Inc.
Tel. (718) 407-7419
james_darrow@fd.org
nora_hirozawa@fd.org

*Attorneys for Vadim Yermolenko*